PAUL KELLY, JR., Circuit Judge.
This is an interlocutory appeal of the district court’s denial of a motion for a preliminary injunction. See Okla. ex rel. Edmondson Tyson Foods, Inc., No. 05-CV-329-GKF-SAJ, 2008 WL 4453098, at *1, *3 (N.D.Okla. Sept.29, 2008). The motion arose out of a 2005 complaint filed by Plaintiffs-Appellants (collectively referred to as Oklahoma) against Defendants-Appellees (collectively referred to as Tyson Foods), which alleged various state and federal environmental claims. 1 Supp. App. at 1-35 (Complaint); II App. Doc. 2 (First Amended Complaint); 1 Supp.App. at 36-74 (Second Amended Complaint). Pursuant to that complaint, on November 14, 2007, Oklahoma filed its motion for a preliminary injunction under the Resource Conservation and Recovery Act (RCRA) of 1976, 42 U.S.C. § 6972(a)(1)(B), seeking to enjoin Tyson Foods from “(1) applying poultry waste to any land within the [Illinois River Watershed (IRW) ] and (2) allowing the application of poultry waste generated at its respective poultry feeding operations and/or the respective poultry feeding operations under contract with it to any land within the IRW.” III App. Doc. 11, at 707. The district court denied a preliminary injunction on September 29, 2008, see Tyson Foods, Inc., 2008 WL 4453098, at *4, and this appeal followed. Our jurisdiction arises under 28 U.S.C. § 1292(a)(1), and we affirm.

Background

The IRW, which encompasses approximately one million acres of land across Arkansas and Oklahoma, is home to hundreds of large-scale poultry farmers with which Tyson Foods contracts to obtain *774 poultry for processing and marketing.[1] V App. Doc. 25, at 1384; VIII App. Doc. 42 (State’s Exhibit 427); 8 Supp.App. at 2503-07. Tyson Foods provides these farmers, also known as “growers,” with chicks, feed, and other support, while the farmers own and manage their own poultry-growing operations. 8 Supp.App. at 2505-08. The chicks are raised in poultry houses, which are floored with bedding materials, including wood shavings, rice hulls, and other organic substances. 1 Supp.App. at 225; 8 Supp.App. at 2507-08, 2605. The farmers then use the “poultry litter,” which includes the bedding materials and poultry feces, as fertilizer on their fields, and often sell or barter it to others. 8 Supp.App. at 2525-26, 2528-32, 2609.
Poultry litter contains the bacteria E. coli, Salmonella, and Campylobacter, all of which can cause a variety of ailments in humans, including death. V App. Doc. 25, at 1495; VI App. Doc. 27, at 1896, 1898; VII App. Doc. 29, at 2244-45, 2268; VIII App. Doc. 39, at 2922 (State’s Exhibit 404). The IRW is a popular area for water recreation and supplies drinking water for residents in the area. V App. Doc. 25, at 1383-84; VI App. Doc. 27, at 1843-44, 1850-52. Oklahoma claims that the land application of poultry litter is a cause of fecal bacterial contamination of IRW waterways. Aplt. Br. 14. In support of this claim, Oklahoma argues that the nature of the soils, terrain, weather, and karst geology in the IRW region make- it a ready transporter of poultry-litter bacteria into rivers, streams, and groundwater supplies. V App. Doc. 26, at 1621-31, 1634, 1640. Therefore, Oklahoma brought its motion in an effort to enjoin “land disposal” of Tyson Foods’s poultry waste in the IRW. See Aplt. Br. 3.
In contrast, Tyson Foods claims that the bacteria in the area comes from myriad sources, including wildlife, various farm animals, and humans. 1 Supp.App. at 232-36; 7 Supp.App. at 2271-72, 2354-59; 8, Supp.App. at 2738-40. Tyson adds that the long-term layering of poultry litter in poultry houses for up to three years, the low rates of humidity in the poultry houses, the subsequent storage and drying of the litter, and its application to fields in a thin layer, thus exposing it to sunlight, results in the death of the bacteria contained within. 8 Supp.App. at 2605-10; see also VI App. Doc. 27, at 1891-92. Furthermore, Tyson claims that IRW bacteria levels do not correlate to poultry farming or litter application, but rather correspond to areas of cattle farming and human activity. 2 Supp.App. at 670-73, 677-81; 8 Supp.App. at 2809-18.
Oklahoma brought its motion for a preliminary injunction under RCRA, which provides that
any person may commence a civil action on his own behalf—
(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present *775 an imminent and substantial endangerment to health or the environment.
42 U.S.C. § 6972(a)(1)(B) (emphasis added). To support its arguments, Oklahoma presented various experts to testify to the bacterial contamination resulting from the use of poultry litter as fertilizer.
Particularly relevant to this appeal are experts Dr. Valerie Harwood and Dr. Roger Olsen. Dr. Harwood holds a Ph.D. in biomedical sciences and is a tenured associate professor at the University of South Florida. VI App. Doc. 27, at 1883-84. She testified to her use of a polymerase chain reaction (PCR) methodology, which she claims allowed her to identify poultry litter DNA in the IRW soil and waters. Id. at 1902-30. Dr. Olsen holds a Ph.D. in geochemistry and works for Camp, Dresser, McKee (known as CDM), an engineering, construction, and consulting company. Id. at 2029-30. He testified to his use of the principal component analysis (PCA) methodology to show excessive bacterial presence in the IRW. Id. at 2035-57. Based on this testimony and that of other witnesses, Oklahoma argues that poultry litter is a substantial cause of the IRWs allegedly dangerous bacterial contamination levels. Aplt. Br. 19.
After conducting eight days of evidentiary hearings, receiving testimony from numerous witnesses, and reviewing hundreds of exhibits, the district court concluded that Oklahoma failed to demonstrate that “bacteria in the waters of the IRW are caused by the application of poultry litter rather than by other sources, including cattle manure and human septic systems.” Tyson Foods, Inc., 2008 WL 4453098, at *1, *3. As a result, Oklahoma failed to meet the heightened standard (as modified by RCRA) required for a mandatory injunction, which this court set forth in O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975-76 (10th Cir.2004) (en banc) (per curiam), aff'd and remanded, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). See Tyson Foods, Inc., 2008 WL 4453098, at *1, *3. The district court further held that the expert testimony of Drs. Harwood and Olsen was not sufficiently reliable under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See Tyson Foods, Inc., 2008 WL 4453098, at *3-4. The court therefore declined to accord their testimony the weight required to establish a link between the poultry litter and the IRW’s bacteria levels. Id. at *4.
On appeal, Oklahoma asserts that the district court erred in denying the motion for a preliminary injunction for three reasons: (1) in failing to apply the liability standard set forth in RCRA to determine whether Oklahoma was entitled to a preliminary injunction; (2) in concluding that the opinions of two expert witnesses were not sufficiently reliable under Daubert; and (3) in failing to state findings of fact and conclusions of law to support its refusal to grant the motion as required under Federal Rule of Civil Procedure 52(a).

Discussion

We review the denial of a preliminary injunction under an abuse of discretion standard. Gen. Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir.2007) (citing Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir.2006)); O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 342 F.3d 1170, 1176-77 (10th Cir.2003), affirmed en banc, 389 F.3d 973, aff'd and remanded, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017. An abuse of discretion occurs when the district court “commits an error of law or makes clearly erroneous factual find *776 ings.” Gen. Motors Corp., 500 F.3d at 1226 (quoting Wyandotte Nation, 443 F.3d at 1252). We have previously characterized an abuse of discretion as “ ‘an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.’ ” RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir.2009) (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1205-06 (10th Cir.2003)). Our review of a district court’s exercise of discretion is narrow, and we consider the merits of the case only as they affect that exercise of discretion. Gen. Motors Corp., 500 F.3d at 1226. We note that in the course of our review for abuse of discretion, we examine the district court’s legal determinations de novo, and its underlying factual findings for clear error. Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir.2002).
In affirming the district court’s denial of a preliminary injunction, we do not address the underlying merits of Oklahoma’s ultimate claims at trial. Because preliminary injunctions are “customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits,” we do not require a moving party to “prove his case in full at a preliminary-injunction hearing....” Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Thus, “the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.” Id.; NLRB v. Acker Indus., Inc., 460 F.2d 649, 652 (10th Cir.1972); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2950 (2d ed.1995); see also Fed.R.Civ.P. 65(a) (indicating that evidence presented at a preliminary injunction hearing need not be repeated at trial).
I. Preliminary Injunction Standard
To obtain a preliminary injunction, the moving party must demonstrate: “(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant’s favor; and (4) that the injunction is in the public interest.” RoDa, 552 F.3d at 1208 (citing Winter v. Natural Res. Def. Council, Inc., — U.S. -, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)). We consider a preliminary injunction to be an extraordinary remedy, and caution courts against granting injunctions that alter the status quo or that require the “nonmoving party to take affirmative action — a mandatory preliminary injunction — before a trial on the merits occurs.” Id. (citing O Centro, 389 F.3d at 977); see also Winter, 129 S.Ct. at 376; Gen. Motors Corp., 500 F.3d at 1226. Because mandatory preliminary injunctions are disfavored, before a district court may grant such relief, the movant must make a heightened showing of the above four factors. RoDa, 552 F.3d at 1208-09; see also O Centro, 389 F.3d at 977. By requiring this heightened showing, “our aim is to minimize any injury that would not have occurred but for the court’s intervention.” RoDa, 552 F.3d at 1209.
In RCRA, Congress envisioned a federal-state partnership, wherein states would develop solid waste management plans in an effort to minimize the needless disposal of recoverable waste and ensure the environmentally friendly disposal of nonrecoverable residues. 42 U.S.C. § 6902. As an enforcement measure, RCRA’s citizen suit provision permits suit against any person “who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid ... waste which may present an imminent and substantial endanger *777 ment to health or the environment.” 42 U.S.C. § 6972(a)(1)(B). Because of this provision, Oklahoma was required to show under the first of the preliminary injunction factors that it had a likelihood of success of establishing at trial that the land application of poultry litter “may present” an imminent and substantial endangerment to those who rely on and recreate in the IRW.
The court denied-Oklahoma’s motion for preliminary injunction after discussing the heightened standard required for granting a mandatory injunction and its intent to weigh heavily the public’s interest in the issuance of the injunction. Tyson Foods, Inc., 2008 WL 4453098, at *1-3. In so doing, the court held that “[t]he State has not yet met its burden of proving that bacteria in the waters of the IRW are caused by the application of poultry litter rather than by other sources,” id. at *1, and that “the State has failed to meet the applicable standard of showing that the bacteria levels in the IRW can be traced to the application of poultry litter,” id. at *4. Essentially, the court denied the injunction as a result of Oklahoma’s failure to establish a causal link between the land application of poultry litter and bacteria in the IRW. As a result of this failure, Oklahoma could not demonstrate that it had a likelihood of succeeding on the merits of its claim that the land application of poultry litter “may present” an imminent and substantial danger, as required by RCRA.
On appeal, Oklahoma argues that the district court erred in failing to apply RCRA’s liability standard, as set forth in 42 U.S.C. § 6972(a)(1)(B), to establish its entitlement to a preliminary injunction. While the district court did not explicitly discuss RCRA’s “may present” language, this did not result in the application of an incorrect legal standard. Our prior case law indicates that under RCRA a plaintiff need not “show proof of actual harm to health or the environment” to establish endangerment, but rather injunctive relief is appropriate where there simply may be a risk of harm. Burlington N. and Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1020 (10th Cir.2007). However, given the district court’s view of the evidence, Oklahoma failed to link land-applied poultry litter and the bacteria in the IRW, so it could not meet even this low hurdle. Oklahoma’s inability to make this necessary evidentiary link meant that it could not establish that poultry litter may be a risk of harm in the IRW waterways. The district court’s opinion amply indicates that it recognized this gap.[2]
*778 There is sufficient record evidence to support the district court’s resolution of this issue. First, it is undisputed that humans, various wildlife, and numerous farm animals, including pigs, sheep, and cattle, rely on IRW lands and waterways, and harbor the various bacteria at issue in this case. 7 Supp.App. 2271-72, 2354-59; 8 Supp.App. 2602-04, 2738-42. Although Oklahoma attempted, through its expert witnesses, to establish that poultry litter was a contributing source of the IRW bacteria, it did not account for these alternative sources of bacteria. 2 Supp.App. 670; 3 Supp.App. 889-90; 7 Supp.App. 2341-42, 2354-59, 2437-38; 8 Supp.App. 2622-26, 2670-78, 2736-42. This omission clearly left the district court with doubt about the potential ameliorating effects of a preliminary injunction. See, e.g., Burlington N. and Santa Fe Ry. Co., 505 F.3d at 1021 (indicating that relief may be in order where “there is reasonable cause for concern that someone ... may be exposed to risk of harm ... in the event remedial action is not taken”).
Second, the parties presented evidence on methods of storage and land application of poultry litter, which facilitate the death of bacteria contained within, leaving further doubt about poultry litter’s contribution to the IRW's bacteria level. VI App. Doc. 27, at 1891-92; 7 Supp.App. 2320-21; 8 Supp.App. 2605-10, 2731-32. Additionally, the record indicates that the land-application of poultry litter is a well-established farming practice. See 1 Supp.App. 273-74, 277-78; 8 Supp.App. 2520-21, 2525; see also Amicus Br. 12-15. That this practice is commonplace and that Dr. Harwood stated that Oklahoma did not identify any humans who have become ill from drinking IRW water contaminated by poultry litter further weakens Oklahoma’s position. 2 Supp.App. 467-68.
Third, Oklahoma failed to conduct a fate and transport study to establish that any surviving bacteria from poultry litter actually reached the waters of the IRW. 4 Supp.App. 1137, 1190-91, 1197-98; 7 Supp.App. 2340-42; 8 Supp.App. 2681-84, 2719-24. Moreover, IRW bacteria levels appear not to differ from bacteria levels in other bodies of water throughout Oklahoma, even where poultry farming is less common. 8 Supp.App. 2809-18.
These points, as well as our review of the lengthy record in this case-, establish that the district court did not abuse its discretion in denying the motion for a preliminary injunction. ' Oklahoma’s inability to link land-applied poultry litter to the bacteria in the IRW precludes a finding that such litter may'present an imminent and substantial endangerment, as required under RCRA’s liability standard. This failure to satisfy the forgiving RCRA standard results in Oklahoma’s inability to demonstrate its likelihood of success on the merits, the first factor required for preliminary injunctive relief.
In conjunction with its argument that the district court applied the wrong legal standard, Oklahoma further claims that the district court formulated a new “sole cause” standard, which improperly required Oklahoma to establish that poultry waste was the only cause of IRW bacteria. Aplt. Br. 33-37. The district court’s opinion does not contain such an error. Rather, the district court held that Oklahoma could not establish that poultry litter was a contributing cause of the bacteria at all:
The evidence produced to this Court reflects that fecal bacteria in the waters of the IRW come from a number of sources, including cattle manure and human waste from growing numbers of human septic systems in that area’s karst topography. The record reflects levels of fecal bacteria at similar levels *779 in rivers and streams throughout the State of Oklahoma, including waterways in whose watersheds the record does not evidence similar application of poultry waste. At this juncture in the action, the State has failed to meet the applicable standard of showing that the bacteria levels in the IRW can be traced to the application of poultry litter.
See Tyson Foods, Inc., 2008 WL 4453098, at *4. In other words, the district court found that the bacteria in the IRW might be caused by any number of contributors, and that Oklahoma, by failing to account for alternative bacterial contributors, had failed to establish that poultry litter was one of those sources. Nowhere does the district court say that poultry litter must be the only contributing source. Thus, we find no abuse of discretion.
II. Expert Testimony
Underpinning the district court’s conclusion that Oklahoma failed to establish a link between poultry litter and IRW bacteria is its finding that the expert testimony of Drs. Harwood and Olsen was “not sufficiently reliable.” Id. On appeal, Oklahoma argues that the court incorrectly relied on Daubert to conclude that the experts’ methodologies were improperly applied, and thus that their conclusions were unreliable. Essentially, Oklahoma claims that Daubert should not have been used to assess the application of the experts’ methodologies, but rather should have been used to assess only the methodologies upon which the doctors relied.
The trial court retains broad discretion in assessing an expert’s reliability and making its ultimate determination of reliability. Goebel v. Denver and Rio Grande W. R. Co., 346 F.3d 987, 990 (10th Cir.2003); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). We will not disturb a trial court’s decision to exclude evidence absent an abuse of discretion, meaning that we have a “ ‘definite and firm conviction that the trial court has made a clear error of judgment or exceeded the bounds of permissible choice.’ ” Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968-69 (10th Cir.2001) (quoting Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164 (10th Cir.1998)) (brackets omitted). Furthermore, while Daubert’s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed.Cir.2002). Thus, the “scope of our review is quite narrow.” Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1206 (10th Cir.2002).
In Daubert, the Supreme Court set forth the standard for admitting scientific evidence pursuant to Federal Rule of Evidence 702. Primarily, a trial judge’s decision to admit or exclude scientific testimony rests on a determination of whether that testimony is relevant and reliable. Daubert, 509 U.S. at 589, 113 S.Ct. 2786. “This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Id. at 592-93, 113 S.Ct. 2786. The standard for admissibility is a flexible one, but the Court set forth a number of factors to consider in making such a determination. Those factors include whether the theory or technique has been tested, subjected to peer review, and published, as well as its known rate of error — essentially that the methodology is scientifically sound. Id. at 593-95, 113 S.Ct. 2786; see also Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir.2003). “The focus, of course, must be solely on *780 principles and methodology, not on the conclusions they generate.” Daubert, 509 U.S. at 595, 113 S.Ct. 2786.
However, as the Supreme Court discussed in General Electric Co. v. Joiner, “conclusions and methodology are not entirely distinct from one another.” 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). It is an elusive process to divine the difference between a methodology and what constitutes a change from that methodology; therefore, under Daubert, we simply hold that “ ‘any step that renders the analysis unreliable renders the expert’s testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.’ ” Mitchell v. Gencorp Inc., 165 F.3d 778, 782 (10th Cir.1999) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir.1994) (emphasis omitted)).
In making its determination here, the district court admitted all proffered expert testimony, denying Tyson Foods’s motions to exclude. 7 Supp.App. 2329-30, 2465-66. Subsequently, the court relied on Daubert to govern the weight accorded to that evidence. Tyson Foods, Inc., 2008 WL 4453098, at *4. In its opinion and order, the court took issue with the fact that the experts’ work had not been peer reviewed or published, and that “no one outside this lawsuit ... has either validated or sought to validate [the experts’] scientific work.” Id. at *4. Thus, the court held the experts’ testimony and conclusions to be insufficiently reliable. Id.
While Oklahoma argues that the district court committed a “legal impossibility” in both admitting the testimony and subsequently finding it unreliable, Aplt. Br. 45, we find no abuse of discretion in the court’s determination. As discussed above, a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation. Moreover, when experts apply methodologies in novel ways, they may arrive at conclusions that result in “ ‘too great an analytical gap between the data and the opinion proffered’ ” to be determined reliable. Hollander, 289 F.3d at 1205 (quoting Joiner, 522 U.S. at 147, 118 S.Ct. 512). In other words, as Tyson Foods argues, when experts employ established methods in their usual manner, a district court need not take issue under Daubert; however, where established methods are employed in new ways, a district court may require further indications of reliability. See Aple. Br. 36 n. 18.
Dr. Harwood testified to her use of microbial source tracking (MST) to identify a DNA biomarker specific to poultry litter bacteria. VI App. Doc. 27, at 1887, 1902-04; 7 Supp.App. 2360-92. Specifically, she used a polymerase chain reaction (PCR) to replicate the bacteria’s DNA, a process that would allow her to identify whether such bacteria were present in various environmental samples. VI App. Doc. 27, at 1902-04; 7 Supp.App. 2324-25, 2326-28. The process relies on the identification and development of poultry-litter-specific DNA fragments, or “primers.” 7 Supp.App. 2330-31. The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it. See, e.g., United States v. Trala, 386 F.3d 536, 541 (3d Cir.2004), rev’d on other grounds, 546 U.S. 1086, 126 S.Ct. 1078, 163 L.Ed.2d 849 (2006) (citing United States v. Trala, 162 F.Supp.2d 336, 347 (D.Del.2001) (holding that PCR evidence is acceptable where FBI maintains an extensive protocol on its application in context of criminal DNA identification)); United States v. Boswell, 270 F.3d 1200, 1205 (8th Cir.2001) (admitting PCR evidence in the context of swine blood, and *781 indicating that “deficiencies” [in the PCR procedure] go to the weight to be given the DNA evidence, not its admissibility); United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir.1996) (indicating that PCR methodology is “sufficiently well established,” but also that a sound methodology may be undercut for various reasons); see also Stills v. Dorsey, 7 Fed.Appx. 856, 859 (10th Cir.2001) (unpublished) (indicating that “objections to the reliability of the PCR analysis go to the weight of the evidence rather than its admissibility”).
The district court’s objection to Dr. Harwood’s PCR methodology, however, arises out of the novelty of its application to an entirely new area, which required the development of primers that had not been identified previously. Thus, the court looked to other indications of reliability, including those enumerated by the Daubert Court, but could find none. The record indicates that Dr. Harwood’s method was “novel and untested.” 8 Supp.App. 2745, 2746-53. In fact, Dr. Harwood herself indicated as much. 7 Supp.App. 2325-26, 2372-76. Moreover, Dr. Harwood’s application of PCR in this area has not been published or peer reviewed. 7 Supp.App. 2333, 2389-90; 8 Supp.App. 2745. In addition, the record casts further doubt on Dr. Harwood’s methodology, suggesting other procedural flaws. See, e.g., 7 Supp.App. 2357-59, 2379-83, 2396; 8 Supp.App. 2754. For all of these reasons, and based on our review of the record, we do not find that the district court abused its discretion in according Dr. Harwood’s testimony scant weight.
The same can be said about Dr. Olsen’s expert testimony. Dr. Olsen relied on principal component analysis (PCA) to identify poultry litter’s “signature” composition (consisting of various metals, chemicals, and bacteria). VI App. Doc. 27, at 2035-36, 2041-52, 2061-63; 3 Supp.App. 813-16; 7 Supp.App. 2427-32, 2435. By using PCA, he claimed to identify poultry litter contamination in the IRW, although he could not trace direct sources of the litter. 3 Supp.App. 814-15. PCA is a statistical method of analyzing data; essentially, it uses a series of equations to identify patterns common to a large data set. VI App. Doc. 27, at 2068-73; 3 Supp.App. 861-63; 7 Supp.App. 2415, 2427-28. As a result, Dr. Olsen was required to make discretionary decisions about which data he would enter into his calculations. VI App. Doc. 27, at 2065-66; 7 Supp.App. 2415, 2427, 2431-32. The discretionary decisions in his methodology had not been tested or peer reviewed, nor did his procedure account for alternative sources of the poultry-litter components. 7 Supp.App. 2432-41; 8 Supp.App. 2646-47. In addition, further doubts were raised regarding Dr. Olsen’s sampling procedures and possible flaws in the data presented. See, e.g., 7 Supp.App. 2415-21, 2443-45, 2448-51, 2456-59. Again, based on our review of the record, we do not find that the district court abused its discretion in discounting Dr. Olsen’s procedures as insufficiently reliable, and thus concluding that Oklahoma did not link poultry litter with the IRWs bacteria levels at this stage of the litigation.
III. Federal Rule of Civil Procedure 52(a)(2)
Additionally, Oklahoma argues that the district court failed to state the findings and conclusions it relied upon in denying the preliminary injunction, as required under Federal Rule of Civil Procedure 52(a)(2). Repeating its argument that RCRA supplies the appropriate standard for assessing legal liability, Oklahoma objects to the district court’s conclusions that it was not entitled to a preliminary injunction because (1) fecal matter in the *782 IRW comes from a variety of sources, and (2) that waters unaffected by poultry litter application outside the IRW are also polluted by fecal bacteria.
Federal Rule of Civil Procedure 52(a) states that, “[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.” The Rule further states that “[t]he findings and conclusions ... may appear in an opinion or a memorandum of decision filed by the court.” Fed.R.Civ.P. 52(a). The requirements are the same for interlocutory injunctions. See Fed.R.Civ.P. 52(a)(2). The rule aims to give reviewing courts “a clear understanding of the process by which [the district court’s] ultimate conclusions were reached.” Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1245-46 (10th Cir.2001); see also Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940). In sum, a district court must sufficiently indicate the factual basis for its conclusions as to ultimate facts, indicate the legal standard against which it has measured the evidence, and broadly cover all material issues. OCI Wyo., L.P. v. PacifiCorp, 479 F.3d 1199, 1203 (10th Cir.2007). We have previously held that there is no need for “excruciating detail” under the Rule. Id. at 1204. Furthermore, inadequate findings of fact constitute harmless error if a reviewing court “can ascertain from the record that one party or the other was clearly entitled to judgment in its favor,” or if there is no danger of confusion about the basis of the decision, the record supports the court’s order, and the record indicates the court heard evidence on each element. Potawatomi Indians, 253 F.3d at 1246.
In its opinion and order denying a preliminary injunction, the district court stated that “the State has not yet met its burden of proving that bacteria in the waters of the IRW are caused by the application of poultry litter rather than by other sources..... As a result, the State has failed to meet the heightened standard for a preliminary injunction.... ” Tyson Foods, Inc., 2008 WL 4453098, at *1. The district court set out the standard for granting a preliminary injunction, determined that the requested injunction required a heightened showing of the four factors, and then indicated that it did not find Oklahoma’s two expert witnesses on the source of bacterial pollutants in the IRW to be sufficiently credible. Id. at *2-4. Therefore, the court held, Oklahoma could not establish causation, and thus by implication Oklahoma could not establish a likelihood of success on the merits of its RCRA claim.
We certainly agree that the district court’s order could have been more explicit, but the grounds for the district court’s decision are sufficiently apparent to allow us to conduct appellate review, namely, it allows us to determine (1) the legal standards employed, (2) whether the findings have sufficient evidentiary support, (3) whether the legal conclusions follow from those findings, and (4) whether the legal conclusions support the grant or denial of relief. Thus, even if this court did find that the district court failed to comply with Federal Rule of Civil Procedure 52(a), the error would be harmless and a remand for clarification would not be necessary because we can ascertain from the record the basis for the denial. Potawatomi Indians, 253 F.3d at 1246 (citing Anthony v. Texaco, Inc., 803 F.2d 593, 600 (10th Cir.1986)). The district court, based on the evidence presented, simply could not establish a sufficient link between land-applied poultry litter and bacteria in the IRW, and therefore preliminary injunctive relief was not appropriate.
*783 AFFIRMED. All pending motions are DENIED.

. The IRW hosts approximately 1,850 poultry houses. V App. Doc. 26, at 1700. A poultry house holds 20,000 to 25,000 birds at once, turning over an average of five to six times per year. Id. at 1697. According to Oklahoma, these houses generate approximately 345,000 tons of poultry waste per year. Id. at 1714; VIII App. Doc. 42 (State’s Exhibit 427).

. We discussed at length the RCRA standard for liability in Burlington Northern, 505 F.3d at 1019-21. While, we reversed a grant of summary judgment in that case, here we deal with factual findings made by the district court after extensive hearings. The dissent argues that the district court employed the wrong legal standard to its factual findings and required Oklahoma to prove actual causation of harm. However, under our deferential standard of review, we are reluctant to presume that the district court failed to evaluate the evidence in light of an applicable legal standard. See Sprint/United Mgmt. Co. v. Mendelsohn, — U.S. -, 128 S.Ct. 1140, 1146, 170 L.Ed.2d 1 (2008). The district court’s factual findings are completely incompatible with granting a mandatory injunction on the theory of potential endangerment. The dissent’s suggestion that we remand for clarification would simply ask the district court to restate in more precise language exactly what it has already said: “the State has failed to meet the applicable standard of showing that the bacteria levels in the IRW can be traced to the application of poultry litter.” Tyson Foods, Inc., 2008 WL 4453098, at *4. In so finding, the district court made a choice between two permissible views of the evidence, and it is not our role to label this choice clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).