**IN THE COURT OF APPEALS OF IOWA**

No. 14-1482
Filed August 5, 2015

**RONALD PECK,**
        Plaintiff-Appellee,

**vs.**

**FOUR ACES FARMS, INC.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Poweshiek County, Annette J. Scieszinski, Judge.

        Four Aces Farms, Inc. appeals from the district court's order granting a declaratory ruling and judgment in favor of Ronald Peck. **AFFIRMED AS MODIFIED.**

        Catherine M. Lucas and Todd A. Strother of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

        William J. Lorenz and Norma J. Meade of Moore, McKibben, Goodman & Lorenz, L.L.P., Marshalltown, for appellee.

        Heard by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DOYLE, J.**

Four Aces Farms, Inc. ("Four Aces") appeals from the district court's declaratory ruling and final judgment order concluding an oral 50/50 crop share agreement supplemented its written cash rent lease agreement with Ronald Peck. We are not persuaded Peck established his case by the requisite degree of proof and we therefore modify the district court's declaratory ruling and judgment.

## I.    *Background Facts and Proceedings*

Ronald Peck is a retired farmer and businessman who owns 690 acres of farmland in Poweshiek County, Iowa. Peck farmed the 690 acres himself until November 2006, when he decided to lease the property to Four Aces. Four Aces, an Iowa Corporation, is operated by Douglas Helm, a former math teacher who began farming full time in 2001. Mark Kennett, an agronomics consultant and Peck's then-partner in a chicken litter[1] application venture, facilitated the landlord-tenant relationship between Peck and Helm.

Helm prepared a farm lease for the 2007 crop season which was signed by the parties in November 2006. The lease provided that Four Aces would pay Peck $195 per acre for 689.5 acres, with payment of $67,226.25 due on March 1, 2007, and $67,226.25 due on December 1, 2007. The lease contained only two additional terms: that Four Aces would pay $0.10 per bushel for rent of storage bins (and would be responsible for electricity and propane associated with the

---

[1] "Poultry litter" includes poultry feces and bedding. Farmers use the poultry litter "as fertilizer on their fields, and often sell or barter it to others." *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.,* 565 F.3d 769, 774 (10th Cir. 2009).

use of the bins), and that Peck would provide "3 ton of chicken litter at the rate of $20 per ton" to be paid for by Four Aces.[2]

Four Aces proceeded to farm the land. During the summer of 2007, when it appeared it would be a very good crop year with rising prices, Kennett talked to Helm. Under the circumstances, it was thought Peck would "be expecting more—more money." The two discussed how to keep Peck satisfied so that Four Aces could continue renting the farm. They discussed paying Peck a bonus—one that would satisfy Peck but still maintain a profit for Four Aces. Four Aces paid the 2007 rent pursuant to the lease terms. Helm testified that at some point he told Peck he would be paid some type of bonus. In September 2008, after the 2007 harvest had been sold, Four Aces paid Peck a "bonus" of $61,251.72, and Helm presented Peck with a detailed accounting showing how he had calculated this extra payment. Specifically, Helm reached the amount by taking half of the "Shared Income" (gross income minus "Shared Expenses"), reduced by the rental payments Four Aces had already made to Peck. Helm later testified he chose the method of calculation to be "fair to both of us" in an effort to "help to continue things for '09 and beyond to maintain good relations" so that Peck would continue to lease the farm to Four Aces. Peck maintained the payment and method of calculation were in accordance with their "50-50 agreement."

Four Aces continued renting Peck's land. In November 2007, the parties signed a written lease for the 2008 crop year, which was identical to the 2007

---

[2] The lease also contained a handwritten provision that "this contract is void as of March 1, 2008."

lease except for an increase in the rent amount to $200 per acre and omission of the chicken litter provision. As it had done the previous year, after the 2008 crop was marketed, Four Aces presented Peck with an additional payment than that required by the written lease—this time in the amount of $27,497.05. Again, Helm gave Peck a detailed accounting showing how he calculated the extra payment, using the same method as he had for the 2007 payment. Helm later testified he made the additional payment to Peck in order "to incentivize, to keep continue renting the farm and maintain good relations." In contrast, Peck testified the parties continued to have an oral agreement that required Four Aces to share profits with him.

The 2009 crop year unfolded similarly. In December 2008, the parties signed a written lease for the 2009 crop year, which was identical to the 2008 lease but for an increase in the bin rental rate to $0.16 per bushel. In the fall of 2010, Four Aces again presented a summary of the profitability of the 2009 crop year. This time, however, the summary showed that the cash rent Four Aces paid to Peck exceeded the profits from the farm, and Four Aces made no additional payment for the 2009 crop year. Peck later testified the rent required by the lease only represented a minimum and that the oral agreement for profit sharing continued to exist.

The parties did not enter into a new written lease for the 2010 and 2011 crop years. Four Aces continued to rent and farm Peck's property. Peck later testified that the 2009 lease was "carr[ied] over" and continued in effect through the 2010 and 2011 crop years.

The parties' relationship began to sour in 2011 after a disagreement arose when a Four Aces employee loaded 2010 grain from Peck's farm into a trailer partially full with Four Aces's grain. Peck felt Four Aces was "cheating" him by commingling the grain. Helm agreed the employee's actions were improper. The incident forced Four Aces to estimate the amount of grain in the load that came from Peck's farm.

While wintering in Florida in early 2011, Peck fell ill, which prevented him from farming 61.7 acres owned by his wife, Beverly, as he had in prior years. Peck contacted Helm seeking Four Aces's assistance with Beverly's land, and Helm "said he would help out." Peck later testified he had no kind of agreement with Helm about the rent, while Helm testified they agreed Four Aces "would just cash rent it . . . under the same lease agreement" it had with Peck.

In August 2011, Peck sent a "Notice" to Four Aces that the contract regarding Peck's land and Beverly's land was "cancelled" for the 2012 crop year.

In the fall of 2011, as in prior years, Four Aces prepared a summary for Peck showing the profitability of the 2010 crop year. Based on the calculation, Four Aces offered to pay $19,218.14 to Peck. Peck refused to accept the payment, later testifying that it was not "calculated proper, and it was not honest per our agreement." According to Helm, he later called Peck and offered him more money in an effort to continue Four Aces's status renting the farm, though he could not recall the amount he offered.

On November 1, 2011, Peck sent Four Aces a letter instructing Four Aces not to market any of Peck's grain and stating, "I will notify you when I desire for the grain to be sold." Peck filed a Uniform Commercial Code (UCC) Financing

Statement covering "[a]ll crops grown upon" the property, establishing a landlord lien.

Helm later testified the grain was not Peck's ("It was [Four Aces's] grain"), so Four Aces disregarded Peck's letter and sold the grain from the farm. A disagreement arose as Four Aces was removing the grain stored on Peck's property, eventually involving law enforcement and the parties' attorneys. Helm presented the sheriff with a written lease for the 2011 crop year; Helm had signed Peck's name on the lease, but later testified Peck had "directed" him to do so.

In a November 2011 letter to Peck, Four Aces (through its attorney) detailed what it represented as "payment in full" for the outstanding amounts Four Aces owed Peck under the written lease, and did not mention a crop share agreement between the parties. The letter included four checks to Peck from Four Aces: $68,950 for "2011 land rent/2nd half"; $9272 for "storage 2010"; $10,817.60 for "2011 storage"; and $12,340 for "2011 cash rent" for Beverly's 61.7 acres. In the letter, Four Aces alleged Peck violated the lease by chopping and chiseling the corn stalks, thereby retaking possession of the properties early and preventing Four Aces from harvesting the corn stover[3] when the lease granted Four Aces possession of the properties until March 1, 2012. In closing, the letter included a formal demand for release of the UCC Financing Statement

---

[3] Corn stover is defined as "corn stalks, leaves, and cobs remaining above ground on the field after the harvest of corn kernels." Jack W. Leverenz, *Corn Flakes Aren't Just for Kellog's, A Look at Corn Stover and Its Effect on Leasing in the Landlord Tenant Relationship*, 17 Drake J. Agric. L. 511 (2012).

filed by Peck, asserting that Four Aces "has performed all obligations under the Farm Lease between the parties."

Peck's attorney returned the checks to Four Aces's attorney with a letter stating:

> For the years since 2007, the agreement has been that Four Aces Farms would lease Mr. Peck's land on a 50/50 crop share basis with a minimum of $200 per acre. It is also our position that Beverly Peck leased her land to Four Aces Farms, Inc. for the 2011 crop year on the same terms as the existing lease between Ron Peck and Four Aces Farms.[4]

Knowing it would not be renting Peck's farm any further, Four Aces did not offer any additional or bonus payments for the 2011 crop year. At the request of Peck's attorney, Four Aces created a summary of profitability for the 2011 year, which included calculations for Beverly's 61.7 acres.

In March 2012, Peck filed a petition for declaratory judgment and for accounting against Four Aces.[5] Peck alleged the parties' lease agreement was in fact a "50/50 crop share lease" that also required Four Aces to pay the minimum amount stated on the written lease. Peck claimed the written leases did not represent the full agreement between the parties. Peck further alleged Four Aces's year-end summaries incorrectly incorporated crop sales from other Four Aces farms when calculating prices received for Peck's crops. Finally, Peck claimed Four Aces did not lease the additional 61.7 acres, rather Four Aces merely performed the farm work for him. Peck requested the district court declare, among other things, that the leases "required that [Four Aces] pay a

---

[4] The letter further stated it was not the full statement of Peck's position and that the purpose of the letter was to return the checks.

[5] Peck also named Helm, personally, as a defendant, but Helm was dismissed as a defendant on June 9, 2014, leaving Four Aces as the sole defendant.

minimum rent based on cash and rent based on a 50/50 crop share"; a full accounting in order to determine the proper net income for each year; a judgment for the difference between that paid and owed based on this new accounting; a declaration that Peck was entitled to receive the 2011 crop from Beverly's 61.7 acres from Four Aces, and a declaration that Four Aces was entitled to compensation for planting, spraying, and harvesting the crop on Beverly's land at ordinary and customary custom rates.

Four Aces filed an answer and counterclaim, denying the existence of a 50/50 crop share agreement. Four Aces further claimed it leased Beverly's 61.7 acres on terms identical to the written leases between Four Aces and Peck. In a counterclaim, Four Aces alleged that in 2011, Peck prevented Four Aces from harvesting corn stalks from the properties in violation of Iowa Code section 562.5A (2011), and sought an order requiring Peck to reimburse Four Aces for the lost value of the unharvested corn stover. Other counterclaims and defenses are not at issue on appeal.

In August 2014, following a one-day bench trial, the district court entered a declaratory ruling and judgment order in favor of Peck, concluding the parties had an oral crop share agreement supplementing the written farm lease:

> The parties' division of farm profits originated during their initial associations as landlord and tenant for the 2007 crop year, and was sustained throughout their lease relationship. The meeting of their minds on sharing the farm's production potential arose in oral discussions Peck had with Helm with the aid of Kennett, as the 2007 crop was growing. Both parties realized they had a written lease in place for Four Aces to pay Peck $195 per acre in two installments; nonetheless, with the March 1st installment already paid, Peck and Helm refined their deal. It was in the summer of 2007 when the crop was looking very good, that they agreed to incorporate a sharing of profits into the agreement.

In reaching this conclusion, the district court considered the testimony of Peck and Helm, as well as Kennett.[6] The court found the previous course of dealings between the parties—especially the methodical nature with which the annual additional payments and summaries were made from Four Aces to Peck—to be significant in reaching its conclusion.

The court determined Four Aces owed to Peck $19,218.14 for the 2010 crop share; $9,272.00 for 2010-11 bin rent; $68,950.00 for the December 2011 cash rent installment; $94,090.74 for 2011 crop share; $10,817.60 for 2011-12 bin rent; and $12,400.00 for 2011 cash rent for Beverly's land—a total of $214,748.48.

The court found in Four Aces's favor on its corn stover counterclaim, stating that by prematurely chiseling the corn stalks Peck denied Four Aces its leasehold right to recover the "full measure of the crop" pursuant to Iowa Code section 562.5A. The parties stipulated the value of the corn stover Four Aces was prevented from harvesting was $20,429.00. The court awarded Four Aces half of this amount—$10,214.50—finding Peck was entitled to half of the value of the stover. The court also credited Four Aces for $461.90, half the cost of a bin repair made by Four Aces.

After off-setting the award to Four Aces on its counterclaim, the district court entered judgment in Peck's favor in the amount of $204,072.08. In

---

[6] It is noted the district court reached its conclusions based upon a preponderance of evidence standard.

addition, the court ordered Four Aces to pay interest at a rate of five percent[7] from March 28, 2012, the date on which Peck filed the suit.[8]

Four Aces appeals.

## II.      Scope and Standards of Review

The standard of review for a declaratory judgment varies by how the case was tried. *See Owens v. Brownlie*, 610 N.W.2d 860, 865 (Iowa 2000). The parties agree the district court tried this case in equity. We conduct a de novo review of cases tried in equity. Iowa R. App. P. 6.907; *Owens*, 610 N.W.2d at 865. We give weight to factual findings made by the district court, especially regarding the credibility of witnesses, but we are not bound by them. *Owens*, 610 N.W.2d at 685.

## III.     Parol Evidence

Four Aces contends the district court "improperly considered parol evidence to modify the terms of an existing written contract." Four Aces claims the parties' written farm lease "set forth all terms needed to carry out enforcement of the agreements" and parol evidence of "[t]he alleged oral agreement" could not be used to vary or add to those terms.

*A. Error Preservation.* Peck contends this issue was not preserved for review. As Peck points out, Four Aces never objected at trial to the use of parol evidence and the district court never ruled on the issue.

---

[7] The district court cited to Iowa Code section 535.2(1)(b) in imposing the five-percent rate.
[8] The date set by the district court from which the interest runs is not challenged by either party.

Four Aces counters that its submission of a pretrial brief—which included a claim that the court was precluded from considering parol evidence—preserves the issue for appellate review despite the absence of a ruling by the trial court on the issue. Although the parol evidence rule is a substantive rule of law, standard error preservation rules regarding the admission of evidence apply to parol evidence issues. *See Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000). "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

This case was tried in equity, and in such cases "'the trial judge, while noting objections, may not exclude offered testimony'" in order to "preserve a complete record of the evidence for the trial and the appellate courts, leaving to them the rejection of inadmissible testimony in deciding the issues." *See O'Dell v. O'Dell*, 26 N.W.2d 401, 416-17 (Iowa 1947) (quoting *Rankin v. Schiereck*, 147 N.W. 180, 182 (Iowa 1914)). Accordingly, at issue is not the admission of the parol evidence challenged by Four Aces, but the court's consideration of that evidence.

Throughout the one-day bench trial, Four Aces lodged no objections to evidence that arguably implicated the parol evidence rule. The pretrial brief that purports to raise the issue of parol evidence did not become a part of the record, though its existence is acknowledged by the parties.

Four Aces claims that by considering the parol evidence when deciding the case, the district court implicitly ruled on the issue and that this, coupled with its argument in its pretrial brief, satisfies the preservation requirements. The

district court's ruling refers to an oral agreement and Helm's calculations and summaries as being evidence of an oral contract between the parties. The inference could be drawn that the district court ruled against Four Aces by using the evidence in reaching its ruling. But without the benefit of objections at trial and Four Aces's pretrial brief, this court cannot be sure which pieces of evidence were contested by Four Aces. The two requirements for preservation, that the issue be both raised and decided by the court, have not been convincingly established. *See Meier*, 641 N.W.2d at 537.

*B. Consideration of Parol Evidence.* Bypassing this error preservation concern, *see State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error preservation problem and proceeding to the merits of the appeal), we do not conclude the district court erred in considering extrinsic evidence. "When an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). An agreement is fully integrated "when the parties adopt a writing or writings as the final and complete expression of their agreement." *Id.* The presence of an integration clause, while considered, is only one factor used in determining if the contract is integrated. *See id.* Extrinsic evidence may be used to consider if the written contract is in fact fully integrated "despite the absence of . . . ambiguity on the face of the document." *In re Eickman Estate*, 291 N.W.2d 308, 312 (Iowa 1980).

Once it is established that an agreement is not fully expressed in writing, extrinsic evidence may be used to find the entire contract. *See Sol Popofsky Co.*

*v. Wearmouth*, 248 N.W. 358, 360 (Iowa 1933); *see also Cargill, Inc. v. Fickbohm*, 252 N.W.2d 739, 741 (Iowa 1977) (allowing oral evidence to show the delivery date term when that field on a form contract had been left blank).  "A contract may . . . be partially written and partially oral."  *Cargill, Inc.*, 252 N.W.2d at 741.  As expressed in *Sol Popofsky Co.*:

> [W]here the entire agreement is not fully expressed in the writing, and where part of the agreement is oral and part in writing, parol evidence may be introduced to show the entire contract . . . .  If the parol part concerns a matter not covered by the writing, then, the written and parol parts being harmonious, the parol part may be shown along with the written.

248 N.W. at 360.  The caveat is that the "parol terms may not directly contradict a clear term of the written agreement."  *Id.*

Four Aces argues that the written lease captures the entire agreement between the parties and thus prevents the consideration of parol evidence.  The language Four Aces relies on reads: "Tenant agrees to pay the owner $200 per acre" and "[t]he land rent is . . . $137,900."

At the outset, we observe the lease lacks an integration clause, which is one factor to consider, although it is not dispositive.  *See C & J Vantage*, 795 N.W.2d at 85.  Describing the written lease as skeletal would be generous considering the major bones it is missing.  There is no legal description of the leased parcels.[9]  The written lease does not describe the type of crops to be grown and, in fact, did not even require Four Aces to farm the land.  Nor did the written lease preclude Four Aces from using the land for non-farming purposes.

---

[9] The lease only indicates the 690 acres of leased parcels were located somewhere within four square miles of land.  The parcels were located in four separate sections of land.  A section is defined as "[a] piece of land containing 640 acres, or one square mile."  *Black's Law Dictionary* 1473 (9th ed. 2009).

Four Aces could have used the land to stage a Wadena-like rock festival, or it could have operated a salvage yard on the property. Other terms typically found in a farm lease are absent. The absence of these significant terms supports the court's finding that the lease was not the full extent of the parties' agreement—the parties obviously knew the location of the leased land and that it was to be used for farming, but simply did not memorialize these terms in the written lease.

The "totality of the evidence" is to be considered when determining if a written agreement is fully integrated. *See id.* The surrounding circumstances and vagueness of the lease persuasively point toward a non-fully integrated agreement between the parties, which allows for the consideration of parol evidence to show the unwritten portion of that agreement. *See Sol Popofsky Co.*, 248 N.W. at 360. The district court properly considered the parol evidence, so we next turn to the question of whether or not Peck established that there was a 50/50 oral crop share agreement.

## IV.    *Oral Agreement*

Peck argues that "[i]n order to give any real meaning to the written contract entered into between the parties, it would be necessary for the parties to also have an oral contract," and "the course of conduct between the parties over the 2007 through the 2011 farm years [evidenced] the parties' oral agreement."

The parties' written agreement,[10] entitled "Farm Lease," provides in full:

> This lease is made between Ron Peck, owner and Four Aces Farms, tenant. This lease will be from March 1, 2009 to March 1, 2010. The parcels of land are approximately 689.5 acres. The

---

[10] Minor changes were made to the leases for the 2007, 2008, and 2009 crop years. For our purposes, we have used the 2009/2010 lease because that was the lease renewed due to lack of termination and in effect at the time the dispute between the parties arose.

parcels are located in Section 29 of Scott Township, Section 34 of Pleasant and Sections 5 & 6 of Jackson Township of Poweshiek County. Tenant agrees to pay the owner $200 per acre.

The land rent is $200 x 689.5 acres = $137,900.
The tenant will pay $68950 on March 1, 2009.
The tenant will pay $68950 on December 1, 2009.
The tenant will pay bin rent at 15 cents per bushel. The tenant will also pay electricity and propane used.

The written agreement includes no reference to any agreement between the parties to share crop profits or other revenues or expenses. But that does not preclude an oral agreement co-existing with the written agreement. This type of relationship has been acknowledged by the supreme court:

An examination of our lease cases wherein oral evidence was offered to show a collateral agreement shows where the parol evidence is of an agreement which did not vary or affect any of the terms of the written lease, but was beyond and independent of it, it was admissible. In [*Witthauer v. Wheeler*, 150 N.W. 46, 47-48 (Iowa 1914),] plaintiff leased from defendant, in writing, for two years a 2400 acre ranch only 200 acres of which was tillable, as a farm and stock ranch. The crop rent was fixed in the writing but no mention was made as to any agreement between the parties jointly conducting the business of stock raising, the parties to share equally in the increase of said stock.

*Gordon v. Witthauer*, 138 N.W.2d 918, 920 (Iowa 1965). And as we observed in the preceding section, this is precisely the type of situation where extrinsic evidence may be admitted to show the complete duties and obligations of the parties. *See Witthauer*, 150 N.W. at 47-48 (affirming admission of evidence of "conversations between the parties prior to the execution of the written lease [to rent land to use as a farm and stock ranch], which as claimed resulted in an agreement between them that appellant was to stock the ranch with cattle which were to be cared for by the appellee, and the increase of the same was to be divided between them"); *see also Parriott v. Levis*, 195 N.W. 578, 579 (Iowa

1923) ("[T]here may be at the same time two contracts coexistent, one of which is in writing and complete in itself, and the other of which is in parol and complete in itself. . . . In such case the written contract is not altered, varied, or changed by proof of the coexistent oral contract. The writing embodies the written contract, and the oral evidence established the parol contract. Even in such a case, evidence of a contemporaneous parol or collateral agreement is only available when it refers to a matter on which the writing is silent, and which is in no manner inconsistent with the terms of the written instrument.").

That having been said, it is Peck's burden to prove there was an oral agreement for a 50/50 crop share. *Hawkeye Land. Co. v. Iowa Power & Light Co.*, 497 N.W.2d 480, 486 (Iowa 1993) ("A party who seeks recovery on a contract has the burden to prove the existence of the contract."). "[P]roof of a claimed oral contract must be clear, satisfactory and convincing. A mere preponderance of the evidence is not enough." *Ehlinger v. Ehlinger*, 111 N.W.2d 656, 659 (Iowa 1961). For evidence to be clear and convincing, it is necessary "that there be no serious or substantial doubt about the correctness of the conclusions drawn from it." *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983). Although only a reasonable certainty an oral contract existed need be shown, the terms must be sufficiently definite to determine with certainty the duties and obligations of each party. *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 165 (Iowa Ct. App. 1993). "For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The written lease provides for cash rent only. To assure good relations and the ability to continue to farm the land, in 2008 Four Acres paid a bonus to Peck in connection with the 2007 crop year. The initial bonus was calculated by Helm in a format reflecting shared income and shared expenses much akin to a 50/50 crop share less the cash rent previously paid. Before paying the 2008 bonus to Peck, Helm discussed the use of a bonus with farm consultant Kennett. Bonus structures were familiar to Kennett, and he explained bonuses were paid by tenants to landlords because the changing grain markets caused negotiated cash rents to go "out of whack." The use of bonuses that were not contractually required also did not violate any rules of the governmental agency, Farm Service Agency (FSA). Four Acres also similarly calculated and paid a bonus in 2009. In 2010, because of reduced profits, no bonus was paid. The landlord-tenant relationship then began to sour.

Unfortunately, the calculation and payment of bonuses apparently left Peck with the impression that he was somehow entitled to a 50/50 sharing of profits—notwithstanding the unambiguous terms of the parties' lease. It seems highly improbable that Helm would have agreed to Peck's version of the contract terms because the contract would have run afoul of the FSA rules. Helm also had a logical reason for paying the bonuses—retaining the ability to farm the land for future years. Moreover, Peck presented no evidence of any conversations with Helm suggesting the parties agreed to a crop share arrangement with or without cash rent. At most, Peck testified, "It was a 50-50 agreement, which we've always done." He referenced no specific conversations with Helm. On the

other hand, both Helm and Kennett testified about their conversation concerning providing a discretionary bonus to Peck.

Other evidence also supports the position of Four Acres. The written lease required full payment of bin rent and chicken litter by the tenant, which is inconsistent with a crop share arrangement where expenses are shared. Four Acres or Helm maintained the crop insurance on all the acres rented, and FSA forms reflected that Four Acres was the sole producer/operator. Further, Peck was not involved in any decision making, except to perhaps share his advice or predictions of the grain markets.[11]

Upon our de novo review of the record, we conclude Peck has not established by clear, satisfactory and convincing proof that an oral 50/50 crop share agreement was ever reached between these parties pertaining to Peck's land or Beverly's land. There was no meeting of the minds concerning a crop sharing arrangement. Accordingly, the district court's declaratory ruling and judgment should be modified to strike the award to Peck of $19,218.14 for 2010 crop share and $94,090.74 for 2011 crop share. Thus, Peck is entitled to recover

---

[11] One commentator has acknowledged the existence of flexible cash rent arrangements in stating, "Flexible or adjustable cash leases set the rent based on the crop yield, the crop price, or a combination of these attributes." Edward Cox, *A Lease-Based Approach to Sustainable Farming, Part II*: *Farm Tenancy Trends and the Outlook for Sustainability on Rented Land*, 16 Drake J. Agric. L. 5, 23 (Spring 2011). But in crop share arrangements,

> [t]ypically landowners contribute a share of the farm inputs and are more involved in land use decision making. This added involvement and risk can affect social security payments, taxes, estate planning, and the distribution of farm program payments. Simply stated, landowners would be more likely to be viewed as self-employed and more likely to be eligible for a share of any farm program payments.

*Id.* Here the parties never committed to any formality of the bonus arrangement. Rather, it was left to the discretion of Four Acres. Further the only sharing Peck wanted to participate in was a share of the profits.

$101,439.60 from Four Aces for 2020-11 bin rent ($9,272.00), 2011 cash rent installment ($68,950), 2011-12 bin rent ($10,817.60), and 2011 cash rent for Beverly's land ($12,400).

## V. *Corn Stover*

As the district court found, "Peck took over during the fall of 2011 and had the corn stalks chiseled in for the 2012 crop preparations. That unilateral act before the lease end, denied the 2011 tenant [Four Aces] opportunity to harvest stover from 2011 corn production." In view of the crop-share agreement it found, the court awarded Four Aces one-half the value of the stover. Four Aces contends the district court "improperly awarded only one-half of the crop stover to Four Aces," contending that it had the right to collect "the full stipulated value of the stover: $20,429."

As set forth above, the parties' agreement did not include a 50/50 profit sharing arrangement. Pursuant to Iowa Code section 562.5A, in the absence of a written agreement to the contrary, "a farm tenant may take any part of the aboveground part of a plant associated with a crop . . . until the farm tenancy terminates." This court recently interpreted this language as entitling a tenant to damages for the value of the destroyed corn stover when the landlord entered the property before the termination of the lease to perform fall tillage, preventing harvest of the corn stover by the tenant. *See Slach v. Heick*, No. 14-0539, 2015 WL 1546445, at *4, 18 (Iowa Ct. App. Apr. 8, 2015). Section 562.5A applies to leases that renew for lack of notice of termination after the provision's effective date of July 1, 2010. *See id.* at *12, 15. Accordingly, section 562.5A applies to the parties' lease for the 2011 crop year, as it was a renewal of the prior year's

lease due to lack of termination on September 1, 2010. *See* Iowa Code §§ 562.6, 562.7. Four Aces was therefore entitled to the full value of the stover, not half as found by the district court. Accordingly, the district court's declaratory ruling should be modified to credit Four Aces in the amount of $20,429, the full value of the crop stover from the 2011 crop.

## VI.    *Interest Awarded on Amounts Tendered*

Four Aces claims the district court "improperly awarded Peck interest on amounts that Four Aces had previously tendered and Peck had rejected." Four Aces contends it is not obligated for interest beyond the date of tender.

The district court ordered that the judgment of $204,072.08 "shall draw interest at the annual rate of five percent, factored from March 28, 2012 [the day Peck's lawsuit was filed]." Four Aces contends its November 21, 2011 letter and enclosed checks totaling $101,379.60 was an unconditional tender to Peck, rendering the district court's award of interest on these amounts improper. A bona fide tender precludes the accrual of further interest on amounts due. *See In re Estate of Zach*, 131 N.W.2d 484, 486-87 (Iowa 1964). But the tender must be "absolute and unconditional" to be effective. *Decorah State Bank v. Zidlicky*, 426 N.W.2d 388, 391 (Iowa 1988).

Peck counters that language of Four Aces's letter indicating the offered checks represented "payment in full" for the 2011 farm rent made the tender conditional—acceptance of which would form an accord and satisfaction discharging Peck's claims against Four Aces.

> To constitute an accord and satisfaction . . . all that is necessary is that the money should be tendered in satisfaction of the claim; that the tender be accompanied with such acts and

> declarations as amount to a condition that, if the money is taken, it is accepted in satisfaction. The conditions under which the tender is made, and the conduct of the party at the time of the tender, however, must be such that the party to whom it is tendered is given to understand that, if he takes it, he takes it in satisfaction of his claim, so far as the other party is concerned. He must either refuse or accept it. If he accepts it, he is bound. If he takes it, his claim is canceled.

*Shahan v. Bayer Vehicle Co.*, 162 N.W. 221, 223 (Iowa 1917).

For the acceptance of the tender to be considered an accord and satisfaction, there must have been a genuine dispute concerning the amount due. *See Olson v. Wilson & Co.*, 58 N.W.2d 381, 386 (Iowa 1953). The November 2011 letter individually listed the amounts enclosed for the 2010-2011 and 2011-2012 bin rents. There was no dispute at the time as to the amount of bin rent due to Peck. These amounts were provided on separate checks and Peck was free to accept them without the risk of discharging his claim. Therefore, the tender of $20,089.60 for bin rent was unconditional and the award of interest on this amount was improper. *See Zidlicky*, 426 N.W.2d at 391.

The parties did have a dispute, however, over the nature of their land rental agreement. Peck had already rejected the 2010 "bonus" payment offered by Four Aces on the basis that it was not properly calculated. Peck's letter instructing Four Aces not to market any of Peck's grain was at direct odds with Four Aces's contention that the leases had no crop share component.

The existence of an accord and satisfaction is generally a question for the trier of fact. *See Perin v. Cathcart*, 89 N.W. 12, 13 (Iowa 1902). We conclude a reasonable trier of fact could have found the letter and accompanying payments—had they been accepted—constituted an accord between the parties

discharging Peck's claim against Four Aces. *See Seidler v. Vaughn Oil Co.*, 468 N.W.2d 474, 478 (Iowa 1991) (remanding to determine if plaintiff "knew or should have known" that accepting a check with "Full, Final Settlement for Damages" written on it was intended as a release of claims against the defendant); *Perin*, 89 N.W. at 13 (stating an accord and satisfaction "need not be express, but may be implied from the circumstances"). The tender of payment for the rental amounts, therefore, was conditional and did not preclude an award of interest *See Zidlicky*, 426 N.W.2d at 391. We therefore affirm the district court on this issue of awarding interest.

We determined above that the rental amounts Four Aces owed to Peck totaled $101,439.60 and that Four Aces was entitled to a set-off of $20,429 for the stover. The parties do not challenge the district court's set-off of $461.90 to Four Aces for a bin motor repair. Reducing the $101,439.60 by the two set-offs, Peck is entitled to $80,548.70. The district court's declaratory ruling and judgment should therefore be modified to reduce the amount subject to the interest award to $80,548.70.

## VII. Conclusion

In accordance with the above opinion, we modify the district court's declaratory ruling and judgment as follows: (a) the awards to Peck of $19,218.14 for 2010 crop share and $94,090.74 for 2011 crop share are deleted, (b) the amount of set-off to Four Aces for the crop stover from the 2011 crop is increased to $20,429, and (c) the amount subject to interest is reduced to

$80,548.70.  We affirm the district court's declaratory ruling and judgment in all other respects.  Costs of the appeal are taxed to Peck.

**AFFIRMED AS MODIFIED.**