**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GENERAL MOTORS
CORPORATION, a Delaware
corporation,

      Plaintiff - Appellant,

v.

URBAN GORILLA, LLC, a Utah
limited liability company,

      Defendant - Appellee.

No. 06-4128

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:06-CV-133-BSJ)**

---

Thomas R. Lee (Gregory D. Phillips, Scott R. Ryther with him on the briefs),
Howard, Philips & Andersen, Salt Lake City, Utah for the Plaintiff–Appellant.

Peter H. Barlow, Strong & Hanni, Salt Lake City, Utah (Erik E. Child, Beyer,
Pongratz & Rosen, Sacramento, California with him on the briefs) for the
Defendant–Appellee.

---

Before **LUCERO**, **MURPHY**, Circuit Judges, and **ROBINSON**, U.S. District
Court Judge.[*]

---

      [*] The Honorable Julie A. Robinson, U.S. District Court Judge, District of
Kansas, sitting by designation.

**LUCERO**, Circuit Judge.

General Motors Corporation ("GM") appeals from the district court's denial of a motion for preliminary injunction against Urban Gorilla, LLC ("Urban Gorilla"). GM alleges that Urban Gorilla's "body kits" infringe upon and dilute GM's trade dress rights in its Hummer line of vehicles. Because the district court did not abuse its discretion in finding that GM failed to make a strong showing of a likelihood of success on the merits, we **AFFIRM**.

**I**

Weighing in at 1.25 tons and able to cross a variety of rough terrain, the military Humvee gained national attention during Operation Desert Storm in 1991. At the urging of then-actor and now Governor Arnold Schwarzenegger, Humvee's manufacturer, AM General Corporation ("AM General") created a civilian version of the vehicle, called the Hummer. In 1999, GM purchased the trademark rights to the Hummer from AM General, and it now markets three versions of the Hummer under the GM brand name: the H1, H2, and H3. GM has a registered trademark in the distinctive shape and design of the H1, the Hummer nose and grill area, the word "Hummer," and the slogan "Like Nothing Else." The H1 retails for around $140,000, and the other models cost less. Since 2000, GM has spent tens of millions of dollars advertising the Hummer line as luxury sport utility vehicles geared toward high-income purchasers.

In 1997, Active Power, Inc. ("Active Power"), the predecessor in interest to defendant Urban Gorilla, launched the Urban Gorilla product line, which consists of steel "body kits." These kits allow customers to install a new body on top of an existing truck chassis, at a price of around $10,000. According to Urban Gorilla, the kits are designed to make a truck look like a military-style vehicle. Urban Gorilla's kits have been advertised in magazines and on the internet since 1997, and one kit was featured on a television show called "Xtreme 4x4" in 2005.

On October 6, 1998, AM General sent a cease and desist letter to Active Power, suggesting that the design of the Urban Gorilla kits infringed on AM General's Hummer trademarks. In response to that letter, Active Power agreed to make changes to the Urban Gorilla product design, but despite AM General's request to review these changes, Active Power never sent them to AM General. AM General did not pursue the matter further, and as noted supra, it sold its interest in the Hummer line to GM the following year. In February 2004, Merrick Maxfield purchased the Urban Gorilla product line from Active Power. He is now president of Urban Gorilla, which continues to produce and market the body kits.

On February 13, 2006, GM filed a complaint against Urban Gorilla for, among other things, trade dress infringement and dilution in violation of the Lanham Act, 15 U.S.C. § 1125(a), (c), and moved for a preliminary injunction.[1]

[1] The complaint contains four claims for relief. On appeal, however, GM only offers arguments as to trade dress infringement and dilution. Because issues

(continued...)

In its complaint, GM alleges that the Urban Gorilla design is a "knock off" of the Hummer, and points to several examples of explicit, public comparisons between the two products.

In 2005, the Urban Gorilla website was changed to include customer testimonials comparing the Urban Gorilla to the Hummer. One customer quoted on the site bragged that at the All Truck Nationals Show, he entered his Urban Gorilla kit truck into a competition against "$125,000 custom Hummers" and won first place. The kit he used was featured elsewhere on the website, with a caption stating that it had recently won first place in a national truck competition against custom Hummer H1s, and claiming "[i]t gives you the look and performance you are looking for." In addition, the site included the slogan, "When Nothing Else Will Do," which GM alleges is similar to the trademarked Hummer slogan, "Like Nothing Else." Although GM concedes that these elements have been removed from the website, it asserts that the testimonials and slogan still appear in an Urban Gorilla catalog. In addition to Urban Gorilla's own promotional materials, GM offered into evidence a November 10, 2005 article from Canada's National Post entitled "Kit will turn your Chevy pickup into a Hummer—on the cheap." The article begins, "Just because you don't own a Hummer doesn't mean you

---

[1](...continued)
not adequately briefed will not be considered on appeal, we do not reach these other claims. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995).

can't drive around looking like you do.  Urban Gorilla's 4x4 off-road body kits cost a fraction of the price and offer a full range of steel bodies that'll make your standard Chevy pickup truck look like 100 grand."

Urban Gorilla responded to GM's complaint and motion for preliminary injunction by pointing out numerous differences in the designs of the products; raising the defenses of laches, acquiescence, and estoppel based on its correspondence with GM's predecessor in interest, AM General; and presenting evidence that its small business would close if an injunction were to issue.  After conducting a hearing on GM's motion, the district court declined to issue a preliminary injunction, finding that there was insufficient evidence to justify GM's request for emergency relief "with particular emphasis on the question of likelihood," but allowing discovery to continue in the case.  GM subsequently moved for an injunction pending appeal in both the district court and this court, and both motions were denied.  GM now appeals from the district court's initial denial of the motion for preliminary injunction.

## II

Pursuant to 28 U.S.C. § 1292(a), we have jurisdiction over appeals from interlocutory orders refusing to grant injunctions.  We review a district court's denial of a preliminary injunction under an abuse of discretion standard. Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir. 2006).  "A district court abuses its discretion when it commits an error of law or makes clearly

erroneous factual findings." Id. Our review of the district court's exercise of discretion is "narrow," Hartford House, Ltd. v. Hallmark Cards, Inc., 846 F.2d 1268, 1271 (10th Cir. 1988), and "the merits . . . may be considered on appeal only insofar as they bear on the issue of judicial discretion." Otero Sav. & Loan Ass'n v. Fed. Reserve Bank, 665 F.2d 275, 276-77 (10th Cir. 1981).

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1255 (10th Cir. 2003) (quotation and citation omitted). In general, "a preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984). Moreover, when a preliminary injunction would alter the status quo, such as the injunction at issue in this case, the movant bears a heightened burden and "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 976 (10th Cir. 2004) (en banc, per curiam), aff'd, 546 U.S. 418 (2006).

**A**

With respect to the first aspect of the preliminary injunction inquiry, GM argues that it is highly likely to succeed on the merits of its claims for trade dress infringement and dilution. Because GM seeks to alter the status quo by halting production of Urban Gorilla products, it must make a "strong showing" with respect to the likelihood of success on the merits. We conclude that the district court did not abuse its discretion in finding that GM failed to meet this burden, and consequently we do not reach Urban Gorilla's defenses.

**1**

Pursuant to the Lanham Act, a person may bring a federal cause of action for trade dress infringement. 15 U.S.C. §1125(a); Hartford House, 846 F.2d at 1271. A product's trade dress "is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques." Sally Beauty Co., Inc. v. Beautyco, Inc., 304 F.3d 964, 977 (10th Cir. 2002) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 n.1 (1992)). To establish a claim of trade dress infringement, a plaintiff must show: (1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional. Id.; 15 U.S.C. § 1125(a)(3).

GM claims that the design of the Hummer line of vehicles constitutes an inherently distinctive trade dress. Because Urban Gorilla does not contest this

assertion on appeal, we will assume, without deciding, that GM could sufficiently demonstrate this factor at a trial on the merits.

In this circuit, likelihood of confusion is a question of fact, Sally Beauty, 304 F.3d at 972, which we review for clear error. Wyandotte, 443 F.3d at 1252. In determining whether a likelihood of confusion exists, we consider a variety of factors, including: (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress. Sally Beauty, 304 F.3d at 972, 979 (listing factors for determining likelihood of confusion in trademark infringement claims and stating the factors "apply equally to trade dress infringement claims") (citations omitted).

On appeal, GM claims that the district court erred in considering only the likelihood of confusion at the point of sale, rather than possible post-sale confusion. At the preliminary injunction hearing, GM argued that potential customers might see an Urban Gorilla kit on the road and attribute any signs of inferior quality to the Hummer brand. GM cites our opinion in United States v. Foote, 413 F.3d 1240, 1246 (10th Cir. 2005), for the proposition that "the correct test is whether the defendant's use of the mark was likely to cause confusion, mistake, or deception in the public in general." That case dealt with claims under the Counterfeit Trademark Act, 18 U.S.C. § 2320, but GM also cites cases from

- 8 -

other circuits addressing post-sale confusion in evaluating claims brought under the Lanham Act.  See, e.g., Chrysler Corp. v. Silva, 118 F.3d 56, 59 (1st Cir. 1997) (recognizing relevance of post-sale confusion in evaluating a trade dress infringement claim); Esercizio v. Roberts, 944 F.2d 1235, 1244-45 (6th Cir. 1991) (concluding that Congress broadened the protections afforded under the Lanham Act to prevent confusion beyond the point of sale); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (noting the relevance of the after-sale context in evaluating the likelihood of confusion); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986) (holding that the Lanham Act protects against post-sale confusion).  Recognizing that the Lanham Act was intended to protect the market as a whole from confusion as to the source of a product, we, like our sister circuits, hold that the likelihood of post-sale confusion is relevant to the trade dress infringement inquiry.  See 15 U.S.C. § 1127 ("The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce . . . [and] to prevent fraud and deception in such commerce . . . .").

With reference to the present case, we conclude that the district court appropriately recognized the possibility of post-sale confusion, but simply found GM's evidence insufficient to justify an emergency order.  In a colloquy with GM's counsel, the court stated that "[t]he more interesting question is confusion of others down the road" upon seeing the completed car kit.  Counsel responded,

"if the case goes forward then GM will spend $100,000 commissioning a survey" to show that people who view an Urban Gorilla kit car associate it with a Hummer. Later, the court noted that "actual confusion . . . isn't the test at all," but went on to conclude that confusion was unlikely. Although a court might infer the likelihood of post-sale confusion based on factors other than evidence of actual confusion, such as the similarity of the competing products, the district court in this case found the evidence as to these other factors to be insufficient.

In particular, the court noted the absence of evidence regarding the intent of the designer of the Urban Gorilla kits. Proof of intentional copying "raises an inference of likelihood of confusion." Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941 (10th Cir. 1983) (quotation and citation omitted). In this case, however, neither party presented evidence as to how Urban Gorilla developed its design, what the original drawings for the kits looked like, or whether the dimensions of the vehicles were similar. Although in its decision the district court placed a great deal of emphasis on this factor, it did not abuse its discretion by doing so.

As to the other factors, the district court found that there was a "genuine question" as to the strength of GM's trade dress.[2] Given the high price of the

_____

[2] From the record, it appears the court was skeptical as to whether the allegedly unique features of the Hummer were not actually shared by all military-style vehicles. This concern touches on several areas of the trade dress infringement inquiry, including distinctiveness, strength of the mark, similarity,

(continued...)

Hummer, the court further concluded that purchasers would exercise sufficient care that they would not be confused by a less expensive kit. Although GM submitted evidence that both it and Urban Gorilla marketed their products on the internet and the television program "Xtreme 4x4," the court focused on the fact that the parties were marketing inherently different kinds of products—a body kit requiring assembly and a finished vehicle.

In sum, the district court properly considered the relevant factors for likelihood of confusion, including the possibility of post-sale confusion, and simply determined that GM had not met its burden at this stage of the litigation.[3] Upon consideration of the record, we conclude that the district court did not abuse its discretion on this issue. Because we reach this decision on the likelihood of confusion element of the trade dress infringement claim, we need not address whether the trade dress is nonfunctional.

**2**

---

[2](...continued)
and nonfunctionality. Although in expressing this observation, the district court did not specifically address these factors individually, we conclude that it did not abuse its discretion by identifying a general problem with GM's claim.

[3] GM offers a list of successful infringement claims against other body kit manufacturers in other circuits, including a case where GM obtained a preliminary injunction against a manufacturer of "knock-off" Hummer kits. General Motors Corp. v. Let's Make A Deal, 223 F. Supp. 2d 1183 (D. Nev. 2002). We refuse to proceed like a moth to the flame. GM's success in one district court against one manufacturer does not release it from the burden of producing sufficient evidence in the present case.

In addition to its claim for trade dress infringement, GM alleges that Urban Gorilla's products cause actual dilution of its trade dress. At the time of the preliminary injunction hearing, the Lanham Act allowed for the owner of a famous mark to seek an injunction against "another person's commercial use in commerce of a mark or trade name, if such use . . . causes dilution of the distinctive quality of the mark."[4] 15 U.S.C. § 1125(c) (rewritten by Pub. L. 109-312, § 2(1)). In Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 422 (2003), the Supreme Court held that "proof of actual injury to the economic value of a famous mark" is required to succeed on a claim for dilution. A plaintiff may prove actual dilution "through circumstantial evidence—the obvious case is one where the junior and senior marks are identical." Id. at 434. At the preliminary injunction hearing, GM did not offer any direct evidence of actual economic harm, and Urban Gorilla presented evidence that the two products were not identical. Based on this evidence, the district court concluded that GM had not presented sufficient circumstantial evidence to indicate that it suffered economic harm. Upon review of the record, we agree that GM failed to make a strong

---

[4] In October 2006, Congress amended 15 U.S.C. § 1125(c) such that a plaintiff may succeed if another mark is "likely to cause dilution." In its brief on appeal, GM does not address this change in the law, whether the change should apply retroactively, or how other amendments to § 1125(c) affect its claim. See § 1125(c)(4) (in civil action for trade dress dilution, plaintiff has burden of proving nonfunctionality, famousness, and that unregistered matter in trade dress is famous separate and apart from fame of any registered marks included in trade dress). Accordingly, we do not address these issues. See Gross, 53 F.3d at 1547.

showing that it was likely to succeed on the merits of its dilution claim with respect to the element of actual dilution.

**B**

In addition to likelihood of success on the merits, GM must also make a strong showing regarding the balance of the equities. With respect to this element of the preliminary injunction inquiry, GM argues that the district court erred in considering the financial hardship to Urban Gorilla. Merrick Maxfield testified that his business would certainly close if an injunction were to issue. In its ruling, the district court held "that there is insufficient evidence to make the kinds of findings that in my opinion ought to be made in reference to an effort to put somebody out of business."

In its brief, GM argues that "[a] defendant who 'openly' and 'intentionally' appropriates a plaintiff's marks 'can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.'" (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)). We agree that when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement. See Processed Plastic Co. v. Warner Commc'ns, Inc., 675 F.2d 852, 858-59 (7th Cir. 1982). In this case, however, the district court found that there was no evidence that Urban Gorilla "intentionally" copied GM's trade dress. Moreover, the court concluded that GM failed to make a strong showing of

likelihood of success on the merits. Where a movant has failed to make a strong case for infringement, it is not entitled to consideration of whether the nonmovant has brought the harm upon itself. Because the district court found GM's showing on the merits to be insufficient, it properly considered the financial hardship to Urban Gorilla that would result from a preliminary injunction.

Finally, GM claims that the irreparable injury to its goodwill far outweighs any financial harm to Urban Gorilla. Although "infringement alone can constitute irreparable injury and . . . the movant is not required to show that it lost sales," GTE Corp., 731 F.2d at 678, in the present case, GM made an insufficient showing with respect to infringement. Thus the district court was not obligated to find irreparable injury to GM and could conclude that "monetary compensation may well be ample and sufficient in the event that GM ultimately prevails." We determine that the district court did not abuse its discretion in balancing the harms.

### III

**AFFIRMED.**