**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**October 22, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PHIBRO BIODIGESTER,

    Plaintiff - Appellant,

v.

MURPHY-BROWN, LLC,

    Defendant - Appellee.

No. 22-4117
(D.C. No. 4:22-CV-00050-RJS)
(D. Utah)

_____

### ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

Plaintiff-Appellant Phibro Biodigester ("Phibro") brought suit against

Defendant-Appellee Murphy-Brown, LLC ("Murphy-Brown") seeking preliminary

and permanent injunctive relief. Phibro and Murphy-Brown are parties to the

Amended and Restated Manure Supply Agreement ("ARMSA"), under which

Murphy-Brown promised to maintain a population of at least 405,000 finisher hogs at

certain facilities and provide finisher manure to Phibro for use in Phibro's anaerobic

digestion facilities. Murphy-Brown announced that it was ceasing operations at its

finisher facilities and depopulating its finisher hogs, and Phibro alleges that in doing

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

so, Murphy-Brown breached provisions of the ARMSA. Phibro moved the district court for a preliminary injunction requiring Murphy-Brown to maintain its finisher hog population at 405,000, and the district court denied that motion. Phibro appeals that decision.

We conclude that the district court did not abuse its discretion—Phibro has failed to show that the harm it will suffer without the preliminary injunction outweighs the harm that Murphy-Brown would experience under the injunction. Therefore, having jurisdiction under 28 U.S.C. § 1292(a)(1), we AFFIRM.

## I. BACKGROUND

Phibro owns an anaerobic digester facility in Beaver County, Utah. Through the anaerobic digestion process, methane gas is captured from hog manure, and that gas can then be used to generate electricity. This creates two marketable products: electricity and renewable energy credits that can be sold into the California Low Carbon Fuel Standard (LCFS) Market. The manure for Phibro's anaerobic digestion facility is supplied exclusively by Murphy-Brown pursuant to the ARMSA.

Murphy-Brown is a livestock producer that owns pig-farming operations at the Blue Mountain, Skyline, and Skyline West farm complexes in Beaver County and Iron County, Utah (the "BMS Farms").[1] Those facilities contained finisher barns—where hogs grow from adolescence to market weight—with combined capacities of 450,000 hogs (the "BMS Finisher Barns"). Murphy-Brown also owned a meat

---

[1] All of Murphy-Brown LLC's members are wholly-owned subsidiaries of Smithfield Foods, Inc.

processing plant in Vernon, California, where it would send nearly all of the finishers it marketed from the BMS Finisher Barns. In 2017, permits were obtained to construct Pinnacle Finisher Farms ("Pinnacle")—a hog-farming operation partially located in Beaver County, Utah, that was designed with anaerobic digesters on site. Pinnacle is owned and operated by twenty-six independent growers—not Murphy-Brown—but Murphy-Brown owns the hogs at Pinnacle, which has the capacity for 239,000 hogs.

### a. The ARMSA

The ARMSA was signed in 2013 by Murphy-Brown and Blue Mountain Biogas, LLC ("BM Biogas")—Phibro's predecessor-in-interest. BM Biogas took out a multimillion-dollar loan from Caterpillar Financial Services Corporation ("Cat Finance") to build an anaerobic biodigester and a generator facility on a plot of land at the BMS Farms. In 2016, BM Biogas defaulted on the loan, and a receiver was appointed to take charge of its assets. Phibro paid $875,000 for the assets in a receivership sale in 2018, and in 2019 the assets—including the biodigestion facilities and BM Biogas's rights under the ARMSA—were assigned to Phibro.

The ARMSA included an initial term of ten years beginning January 1, 2013, followed by two automatic five-year renewal periods. Under the ARMSA, BM Biogas (and now Phibro) promised to purchase all the manure it required from Murphy-Brown, and Murphy-Brown promised to sell to BM Biogas all the manure it

3

required[2].  In exchange for the manure, BM Biogas promised to pay Murphy-Brown a royalty payment based on its gross electricity sales from its generating facility. (Aplt. App. 2:279, 288) (setting the royalty rate at 2.5% for the first five years and 4% for the following five years).  BM Biogas then promised to return the manure to Murphy-Brown's holding ponds after it had been processed.  The "delivery point" for the manure was defined as "the end point of the gravity sewers adjacent to" Murphy-Brown's Finisher Barns.  (Aplt. App. 2:277)  BM Biogas had to build piping to connect the delivery point to its facilities, and it did not build piping to deliver manure from all of the BMS Finisher Barns.  While there were pipes built to connect some of the finisher barns at the Skyline and Skyline West farms, those pipes were not operative when Phibro began its operations, and Phibro only received manure from the Blue Mountain finisher barns.

The ARMSA contains a number of provisions that are relevant in this case:

- Minimum finisher requirement: Murphy-Brown promised to maintain a minimum number of finishers at the BMS Finisher Barns, which was set at 90% of its capacity for finishers (405,000 finishers).  Murphy-Brown could only reduce its finisher population below that threshold if it first "reduced to zero the number of finishers from barns that are not part of any Production Pod."  (Aplt. App. 2:284).

---

[2] "Manure" is defined in the ARMSA as, "all manure from finishing operations from the hogs located at the Production Pods."  (Aplt. App. 2:279).  "Production Pod(s)" is defined as, "the Skyline West Production Pod, the Skyline Production Pod, and the Blue Mountain Production Pod."  Id.

- Early termination: Murphy-Brown has the right to terminate the ARMSA if it ceased operations of the BMS Farms altogether.

- Limitation of liability: "[N]either of the Parties, nor any of their respective partners, principals, officers, directors, agents, representatives, affiliates, or employees, shall be liable for consequential or indirect loss or damage, including loss of profits, cost of capital, loss of goodwill, increased operating costs or any other special or incidental damages, arising out of" the ARMSA or nonperformance of the ARMSA.  (Aplt. App. 2:293).

- Dispute resolution: The parties agreed to a pre-litigation dispute resolution procedure, which involved communication between the parties and mediation. However, with respect to equitable remedies, the ARMSA provides that "either Party may proceed directly to a court of equity to request such a remedy." (Id.).

**b.  Phibro's investments and operation of the facilities**

By the time Phibro purchased the biodigester and generator facilities in late 2018, the facilities had fallen into disrepair.  In addition to the $875,000 Phibro spent to acquire BM Biogas's assets, it spent over $4 million to restore the facilities, and that process took most of 2019.

Since taking over the facilities, Phibro has operated at a substantial loss. Documentation from September 2022 showed a net income of negative $5,119,658.32—$5,823,509.80 in expenses, and only $703,851.48 in profit.  While initially there were pipes built to connect some of the finisher barns at the Skyline

5

and Skyline West farms, those pipes were not operational when Phibro began its operations, and Phibro never made those pipes operational—it only received manure from the Blue Mountain finisher barns. Additionally, Phibro made multiple representations to Murphy-Brown that it would be taking all of the available finisher manure, but it never took more than about 50% of the available manure after May 2020. Finally, Phibro's facilities have not operated at full capacity. At one point, one of Phibro's two biodigesters needed repairs that were delayed—causing the facility to operate with just one biodigester. And while there are two generators at the facility, one is not operational, and the other is not owned by Phibro—it is owned by a different company, Phibro Americas, LLC.

Additionally, the district court found that Phibro identified "no contracts it must fulfill, no customers reliant upon it, and no reputation that it has to lose." (Aplt. App. 12:2940). A review of the record suggests that Phibro only identified one contract—a contract with the owner of the one operational generator at its facilities, Phibro Americas, LLC. And while Phibro Americas, LLC, had sales agreements with two different customers, one of those was set to expire on December 31, 2023, and there is no indication that it was extended.

### c. Murphy-Brown ceases its operations at the BMS Finisher Barns

In June 2022, Murphy-Brown announced that it was shutting down its processing plant in Vernon, California, due to the high cost of doing business in California. Due to the closure of the Vernon plant, which had been the destination for most of the finishers from BMS Finisher Barns, Murphy-Brown determined that it

was no longer economically feasible to operate the BMS Farms. Therefore, around June 2022, Murphy-Brown stopped inseminating sows at the BMS Farms, and it sent letters to farmers working at the BMS Finisher Barns indicating that new pigs would not be sent to the barns after the current pigs were sent to market. Given the closures of the BMS Finisher Barns, Murphy-Brown reduced the size of its workforce in Utah. Murphy-Brown made job offers to all of the employees losing their jobs due to the closures, a majority of which have been accepted, and some of which were for jobs outside of Utah.

On August 22, 2022, Murphy-Brown notified Phibro that it was terminating the ARMSA, to be effective when it ceased operations of the BMS Farms. Murphy-Brown projected that it would cease operations on or before February 2023. As of January 26, 2024, the BMS Finisher Barns had been completely depopulated of finisher hogs.

## II. PROCEDURE

Phibro sued Murphy-Brown in August 2022 alleging that Murphy-Brown's plan to depopulate the BMS Finisher Barns without first depopulating other facilities would breach the ARMSA. Phibro sought a temporary restraining order and preliminary and permanent injunctive relief. Phibro moved for a temporary restraining order, and the district court denied Phibro's motion on the ground that Phibro had failed to establish that it will suffer irreparable harm without relief or that the balance of harms favors relief. However, the district court found that Phibro demonstrated a likelihood of succeeding on the merits of its claim. The court

interpreted the ARMSA as requiring Murphy-Brown to depopulate all of its farms nationwide before it could depopulate the BMS Finisher Barns, and it found that Murphy-Brown had not done so.

Phibro then filed an amended complaint which also sought a preliminary and permanent injunction—specifically, an injunction requiring Murphy-Brown to maintain a hog population of 405,000 at the BMS Finisher Barns. After expedited discovery, Phibro moved for a preliminary injunction, and the district court denied that motion. The district court first reasoned that Phibro failed to establish that it would suffer irreparable harm without the injunction. The court noted that Phibro's only causes of action are for breach of contract, for which the typical remedy is damages, and that damages could be calculated based on historic performance and projections of future performance. The district court also concluded that the balance of harms did not favor an injunction. The court reasoned that a preliminary injunction would require Murphy-Brown to spend millions of dollars to operate a segment of its business that it deemed not economically feasible, even though Phibro had not taken more than 50% of Murphy-Brown's available manure and Phibro had operated at a substantial loss since acquiring the rights to the ARMSA and the facilities.

The district court then entered judgment and closed Phibro's case, despite the fact that Phibro had a pending claim for a permanent injunction. Phibro moved the district court to reopen the case. Then, Phibro filed its notice of appeal with this court, challenging two decisions by the district court: 1. Its denial of Phibro's motion

for a preliminary injunction; and 2. Its entry of judgment in Phibro's case. We abated Phibro's appeal pending the district court's resolution of Phibro's request to reopen the case. The district court granted that motion in September 2023, and we lifted the abatement of Phibro's appeal in October 2023.

## III. JURISDICTION

As an initial matter, Murphy-Brown argues that Phibro's appeal is moot under both Article III and this court's prudential mootness doctrine. We reject both arguments and conclude that we have jurisdiction over this appeal.

### a. Legal Standard

"Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." Disability L. Ctr. v. Millcreek Health Ctr., 428 F.3d 992, 996 (10th Cir. 2005) (citing U.S. Const. art. III, § 2, cl. 1). "Demonstrating mootness is a 'heavy' burden, . . . and that burden 'lies with the party asserting mootness'"—here, the burden lies with Murphy-Brown. Copar Pumice Co. v. Tidwell, 603 F.3d 780, 792 (10th Cir. 2010) (citations omitted). This court reviews the question of mootness de novo. Id.

"Federal courts may adjudicate only actual controversies." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990). "The controversy must exist during all stages of the appellate review. Once such controversy ceases to exist, the action is moot and this court lacks jurisdiction to adjudicate the matter." Disability L. Ctr., 428 F.3d at 996  (internal quotation marks, citation omitted). Generally, this court has jurisdiction to review a district court's order denying a preliminary injunction.

28 U.S.C. § 1292 (a)(1).  However, this court loses jurisdiction "if an interlocutory appeal no longer presents a live case or controversy."  Fleming v. Gutierrez, 785 F.3d 442, 444 (10th Cir. 2015).

With respect to prudential mootness, we described the doctrine in Southern Utah Wilderness Alliance v. Smith:

> Closely related to Article III mootness is the "prudential mootness" arising from doctrines of remedial discretion.  Prudential mootness addresses "not the power to grant relief but the court's discretion in the exercise of that power."  Chamber of Commerce v. United States Dep't of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980).  In some circumstances, a controversy, though not moot in the strict Article III sense, is "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant."  Id. . . .  Under both Article III and prudential mootness doctrines, the central inquiry is essentially the same: have circumstances changed since the beginning of litigation that forestall any occasion for meaningful relief.

110 F.3d 724, 727 (10th Cir. 1997).

### b. Analysis

Murphy-Brown argues that an interlocutory appeal challenging the denial of a preliminary injunction "is moot where the effective time period of the injunction has passed, or where the act sought to be enjoined has occurred."  (Aplee. Br. 26) (emphasis omitted) (quoting Fleming, 785 F.3d at 445 (citations and internal quotations omitted)); Thournir v. Buchanan, 710 F.2d 1461, 1463 (10th Cir. 1983) ("[W]here an act sought to be enjoined has occurred, an appeal of a district court order denying an injunction is moot.").  Here, Murphy-Brown argues that Phibro

framed its injunction request below as preventing Murphy-Brown from <u>reducing</u> its hog population below 405,000 hogs and requiring Murphy-Brown to <u>maintain</u> the hog population above 405,000—not to <u>repopulate</u> hogs after the population fell below 405,000.  And Murphy-Brown has now completely depopulated its hogs from the BMS Finisher Barns.  Therefore, Murphy-Brown argues, the act sought to be enjoined—Murphy-Brown <u>reducing</u> the population of hogs below 405,000—has already occurred, and Phibro's preliminary injunction appeal is moot.[3]

We reject Murphy-Brown's argument.  Our precedent establishes that the occurrence of the act sought to be enjoined does not always moot an appeal challenging the denial of the injunction—instead, such an appeal is only mooted when "an event occurs . . . that <u>makes it impossible</u> for the court to grant any effectual relief whatever to a prevailing party."  <u>Fleming</u>, 785 F.3d at 445 (emphasis added) (citation omitted); <u>see</u> <u>Boerschig v. Trans-Pecos Pipeline, L.L.C.</u>, 872 F.3d 701, 704 (5th Cir. 2017) (describing a "well-established exception" to general rule that occurrence sought to be enjoined moots appeal of the denial of the injunction: "when the defendant completes the act to be enjoined despite having notice of the request for injunctive relief, the plaintiff is not deprived of appellate review if the reviewing court can restore the status quo"); <u>Moore v. Consol. Edison Co. of New York</u>, 409 F.3d 506, 510 n.4 (2d Cir. 2005) (citing the "well established principle that 'where a defendant with notice in an injunction proceeding completes the acts sought

---

[3] Murphy-Brown makes the same mootness argument under both Article III and the prudential mootness doctrine.

to be enjoined the court may by mandatory injunction restore the status quo'"
(quoting Porter v. Lee, 328 U.S. 246, 251 (1946)).

Here, it is not impossible for the district court to grant effectual relief—it could grant an injunction requiring Murphy-Brown to repopulate the BMS Finisher Barns with 405,000 hogs. We reject the argument that, by requesting such relief, Phibro has "expand[ed] the request for injunctive relief" beyond what was requested in its motion for preliminary injunction below. (Aplee. Br. 29) (quoting Caddo Nation of Okla. v. Wichita & Affiliated Tribes, 877 F.3d 1171, 1177 (10th Cir. 2017)). While Phibro framed its requested relief below as an order prohibiting Murphy-Brown "from reducing the hog population" to below 405,000 hogs, it also framed its request as an order requiring Murphy-Brown "to maintain a population of no fewer than 405,000 hogs." (Sealed Aplt. App. 14:3351, 3393) (emphasis added). The latter request is broad enough to encompass Phibro's requested relief on appeal—an order requiring Murphy-Brown to maintain a hog population of 405,000 by re-establishing that population. See Maintain, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/maintain (2024) (defining "maintain" as both "to keep in an existing state" and "to support or provide for").[4]

---

[4] Caddo Nation is distinguishable. In Caddo Nation, the Caddo Nation of Oklahoma sought an emergency temporary restraining order to prevent the Wichita Tribe from continuing construction on a site that Caddo leaders believed contained Caddo graves. Caddo Nation, 877 F.3d at 1175. By the time this court heard the Caddo Nation's challenge to the district court's denial of the restraining order, the Wichita Tribe had finished the construction. Then, the Caddo Nation suggested that "this court sua sponte on appeal should expand the request for injunctive relief and fashion a remedy that allows Caddo Nation 'to test the [building site] for Caddo

## IV. STANDARD OF REVIEW

We review the district court's denial of a preliminary injunction for abuse of discretion. Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 775 (10th Cir. 2009). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir. 2006). "[I]n the course of our review for abuse of discretion, we examine the district court's legal determinations de novo, and its underlying factual findings for clear error." Tyson Foods, 565 F.3d at 776.

## V. DISCUSSION

### a. Legal Standard

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Gen. Motors Corp. v. Urb. Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted). A party

---

gravesites, remains, and cultural patrimony.'" Id. at 1177. This court declined to do so because the Caddo Nation never requested such relief from the district court—instead, they only requested an order preventing construction of the building. The relief requested here is unlike that in Caddo Nation.

seeking a preliminary injunction must provide evidence supporting its entitlement to relief.  See id. at 1267.

"The movant's burden is greater when the requested injunction is 'mandatory' rather than 'prohibitory.'"  Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch, 23 F.4th 1262, 1274 (10th Cir. 2022).  An injunction is prohibitory when it prohibits the defendant from taking an action; it is mandatory when it requires the defendant to take an affirmative action.  Id. at 1274-75.  Here, the district court characterized the injunction as mandatory—Phibro asked for an injunction requiring Murphy-Brown to "maintain a population of no fewer than 405,000 hogs at the BMS Finisher Barns."  (Aplt. App. 12:2961).[5]  We agree that Phibro is asking for a mandatory injunction.  Therefore, Phibro was required to make a "strong showing" that the "likelihood-of-success-on-the-merits and the balance-of-harms factors" favored granting its requested injunction.  Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792, 797 (10th Cir. 2019).

As the movant has the burden of establishing all four elements of the preliminary injunction standard, its failure to establish any single element is dispositive.  Here, we need only consider the third element—the balance of harms.

---

[5] Phibro argued below that the injunction was prohibitory, not mandatory, as it merely required Murphy-Brown to maintain the existing hog population.  The district court rejected this argument because Murphy-Brown would have had to take affirmative actions to keep the hog population above 405,000—for example, Murphy-Brown would have had to inseminate sows to replace the hogs that would be sold at market.  On appeal, Phibro recognizes that Murphy-Brown has depopulated hogs at the BMS Finisher Barns and therefore Phibro "declines to challenge the district court's characterization of the injunction as mandatory."  (Aplt. Br. 31-32).

See, e.g., Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army, 111 F.3d 1485, 1489 (10th Cir. 1997) ("We . . . affirm the district court's denial of Plaintiffs' request for a preliminary injunction on the basis of its balance of harms finding, obviating the need to address Plaintiffs' other arguments justifying a preliminary injunction in this instance.").

### b. Analysis

We conclude that Phibro has failed to carry its burden of establishing that the balance of harms weighs in favor of granting the preliminary injunction—that is, Phibro has not shown that its harm without the preliminary injunction outweighs the harm that the preliminary injunction would cause to Murphy-Brown. First, we agree with the district court that the harm to Murphy-Brown under a preliminary injunction requiring it to repopulate the BMS Finisher Barns with 405,000 hogs would be substantial. The preliminary injunction would force Murphy-Brown to expend considerable money and resources to repopulate the hogs and continue to operate its BMS Finisher Barns at 90% capacity, despite the fact that the primary destination of its finishers—the Vernon plant—shut down, Murphy-Brown had determined that the BMS Finisher Barns were not economically feasible in light of that fact, Murphy-Brown offered new jobs—some of which are out-of-state—to all of the employees implicated by the closure of its finisher barns, Phibro did not historically take more than 50% of the available manure from Murphy-Brown's finishers, and Phibro itself has been operating at a substantial loss since it acquired the facilities and the rights to the ARMSA in 2019.

15

We also conclude that the district court did not abuse its discretion in rejecting Phibro's argument that Murphy-Brown's harms "lose much of their force because they are self-inflicted." (Aplt. Br. 50-51). They appear to be market driven.

Second, the district court did not abuse its discretion in concluding that any harm suffered by Phibro does not outweigh the harms to Murphy-Brown. Phibro asserts that it will be put out of business if Murphy-Brown is not required to repopulate the BMS Finisher Barns and provide manure.[6] Even if Phibro has shown it will be put out of business without manure from Murphy-Brown—its business's primary input—such harm does not weigh strongly in support of the preliminary injunction. "[N]ot every company's failure will warrant equitable relief. For example, the dissolution of a new enterprise, or one that's not very important to its owner (who may own many companies), may be reparable by damages." Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 719 (4th Cir. 2021); Husky Ventures, Inc. v. B55 Invs., Ltd., 911 F.3d 1000, 1012-13 (10th Cir. 2018) ("[T]he destruction of a business could amount to irreparable harm" (emphasis added)). Here, Phibro had been operating at a substantial loss, and there was no reliable evidence indicating that it would turn its business around.[7] While Phibro points to evidence that its minimum

---

[6] In its order denying the preliminary injunction, the district court stated "Phibro's reliance on assertions it will go out of business without pointing to supporting evidence is insufficient to meet its burden to show irreparable harm will occur without injunctive relief." Id. at 12:2976.

[7] Phibro argues that its poor historical performance can largely be explained by the fact that it has not operated under normal circumstances since taking over the facilities in 2019. But these are factual matters that can later be addressed at the damages trial in this case.

16

projected net income through 2033—the end of the ARMSA's term—would have been $13 million, the district court concluded that was not "a reliable figure for the court to evaluate." (Sealed Aplt. App. 16:4063).  This was not an abuse of discretion—the $13 million projection assumed additional capital investments of $1.7 million and Phibro's ability to operate at 30 Megawatts daily, but the record does not indicate that Phibro made those investments, and its daily production was only 16 Megawatts.  Additionally, Phibro is just one of many companies owned and operated by Phibro, LLC, and Phibro, LLC has invested relatively little in Phibro in relation to its other businesses.  See, e.g., (Sealed Aplt. App. 16:3830) (deposition of Simon Greenshields, the Chairman of Phibro's Board, describing the web of businesses owned by Phibro, LLC, including a marketing business in China and various marketing and trading businesses in America); (Id. at 16:3832) (same, discussing $450 million investment by Phibro, LLC in a fertilizer facility in Indiana).

We likewise conclude that the district court did not abuse its discretion in concluding that Phibro has failed to provide sufficient evidentiary support for its assertion that it will lose customers and goodwill without the preliminary injunction. As described above, the only contract in the record to which Phibro is a party is its contract with Phibro Americas, LLC—the owner of the functioning generator at its

---

Nonetheless, as described above, the record indicates that Phibro has generated relatively little income in comparison to its expenses, and as explained below, it has not provided reliable evidence indicating that it will turn that around.

facilities.[8]  And while Phibro Americas, LLC had sales contracts with at least two parties, one of those contracts was set to expire at the end of 2023.  This evidence does not support Phibro's argument that its asserted harm of lost customers and goodwill weighs in favor of preliminary injunctive relief.

## VI. CONCLUSION

We conclude that Phibro has failed to establish a clear and unequivocal right to its requested preliminary injunction, as required to prevail here.  The district court did not abuse its discretion in concluding that the harms to Phibro without its requested preliminary injunction do not outweigh the harms that Murphy-Brown would experience if it was ordered to repopulate the BMS Finisher Barns with 405,000 hogs.  Our decision in this interlocutory appeal does not foreclose the possibility that Phibro will be able to establish its entitlement to permanent injunctive relief after further proceedings below.[9]

---

[8] Phibro cited evidence below—a declaration by Simon Greenshields, the Chairman of Phibro's Board—indicating that it had three existing wholesale customers.  The district court did not give that evidence much weight because Phibro was not a party to the only contracts Phibro produced that were connected to those customers.  That decision was not an abuse of discretion.

[9] There appear to be three pending motions before the panel.  First, Phibro filed a motion seeking an expedited schedule for oral argument and decision.  That motion is now denied as moot.

Second, Phibro filed an unopposed motion to seal the last three volumes of its appendix (Vols. 14-16).  That motion was provisionally granted by the clerk's office subject to reconsideration by the merits panel (the clerk's office only granted the motion with respect to volumes 14-16).  That motion is granted subject to any disclosures made in this Order and Judgment which the Court determines to unseal.

Third, Murphy-Brown's unopposed motion to file its response brief under seal is granted.

We therefore AFFIRM.

Entered for the Court


David M. Ebel
Circuit Judge